IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | |
|---|---|
| BIBLE STUDY TIME, INC., | C/A No. 3:17-cv-00283-CMC |
| Petitioner, | |
| v. | |
| UNITED STATES OF AMERICA | Order Denying Petition to Quash and Granting Motion to Dismiss |
| Respondent. | |

Petitioner, Bible Study Time, Inc. ("BST"), initiated this action pursuant to 26 U.S.C. § 7609(b)(2)(A) seeking to quash third-party summonses the Internal Revenue Service ("IRS") served on eight banks: Carolina Alliance Bank, Capital Bank, N.A., First Citizens Bank & Trust Co., SunTrust Bank, First South Bank, NBSC (a division of Synovus Bank), and Regions Bank (collectively "the Banks"). ECF No. 1 (Petition to Quash Third-Party Summonses ("Petition")). The challenged summonses seek BST's banking records for the twelve month period ending December 31, 2013 ("2013 Tax Year").

The Petition asserts the summonses are invalid for four reasons. ECF No. 1 at 1, 2. First, the purpose is improper because the summonses were issued in support of a church tax inquiry and examination that were not properly authorized under 26 U.S.C. § 7611 ("Section 7611'") and the summonses are intended to coerce the taxpayer into responding to the improperly authorized inquiry and examination. *Id.* at 1. Second, the IRS already has the information it seeks. *Id.* Third, the IRS failed to provide BST the statutorily required notice before issuing the summonses. *Id.* Fourth, the summonses violate a statutory prohibition on repetitive church inquiries or examinations within a five-year period. *Id.* at 2.

The United States ("Government") filed a motion to dismiss the petition. It argues the summonses are proper, regardless of whether the church inquiry and examination were properly initiated, because third-party summonses are governed by 26 U.S.C. § 7609 ("Section 7609"), not Section 7611, and the summonses satisfy the standards applicable to third-party summonses.

Through its opposition, BST challenges the Government's legal arguments and contention the summonses were issued for a legitimate purpose. BST does not expressly abandon any of the arguments advanced in its petition, though it fails to advance some of them.

The matter has now been fully briefed. For reasons explained below, the Government's motion to dismiss is granted and BST's petition to quash is denied. The challenged summonses are, therefore, enforceable as written.

## PROCEDURE AND STANDARD

**Notice and Right to Challenge.** Section 7609 addresses third-party summonses issued by the IRS, requiring, inter alia, notice of issuance to any person named in the summons (other than the third party to whom the summons is directed) and authorizing the noticed person to petition to quash the summons. 26 U.S.C. §§ 7609(a), (b). It is undisputed BST falls within the class of persons entitled to notice of a third-party summons under Section 7609(a)(1) and authorized to file a petition to quash under Section 7609(b)(2). BST argues the Government failed to give proper advance notice that third-party summonses *might be issued* (an argument based on the "General notice" provisions of 26 U.S.C. § 7602(c)(1).[1] It does not challenge the Government's compliance

---

[1] Section 7602(c)(1) reads as follows: "**General notice.** – An officer or employee of the Internal Revenue Service may not contact any person other than the taxpayer with respect to the determination or collection of the tax liability of such taxpayer without providing reasonable notice in advance to the taxpayer that contacts with persons other than the taxpayer may be made." 26

with Section 7609(a)'s notice provisions, which are specific to third-party summonses.  *See* 26

U.S.C. § 7609(a)(1) (requiring person identified in the summons, other than the person summoned,

be given notice of the summons "within 3 days of the day on which . . . service is made, but no

later than the 23rd day before the day fixed" for responding to the summons).

**Jurisdiction.**  Jurisdiction over a petition to quash exists in the district in which the persons

or entities summoned reside or are found.  26 U.S.C. § 7609(h)(1).  BST alleges and the

Government does not contest that each of the Banks summoned may be found in this district.[2]

Thus, this court has jurisdiction over BST's petition to quash.

**Stay Pending Resolution.**  When a timely petition to quash is filed, no examination of the

records sought by the challenged summons may be made "except in accordance with an order of

the court having jurisdiction of such proceeding or with the consent of the [petitioner]."  26 U.S.C.

§ 7609(d).  It is undisputed that no responses to the summonses have been provided.

**Standards and Elements.**  Proceedings to enforce or quash an IRS summons are

adversarial, but generally summary in nature.  *United States v. Clarke*, __ U.S. __, 134 S. Ct. 2361,

2367-68 (2014).  As the Fourth Circuit Court of Appeals explained in *Conner v. United States,*

434 F.3d 676 (4th Cir. 2006):

> When an interested party challenges enforcement of an IRS summons, under *United States v. Powell*, 379 U.S. 48 (1964), the initial burden rests with the government to establish a *prima facie* showing of good faith in issuing the summons, requiring

---

U.S.C. § 7602(c)(1).  The IRS relies on a general notice included a publication ("IRS Publication 1") mailed to BST in February 2015 as satisfying this requirement.  BST argues this notice was too remote in time and too general to satisfy the advance-notice requirement as to summonses issued in October 2016.

[2]  Four of the summonses reflect service on the Banks using addresses within South Carolina.  While the other four summonses were directed to addresses outside South Carolina, the parties have stipulated that all may be "found" within South Carolina.  ECF No. 16.

proof that the IRS has satisfied the following four elements:  (1) the investigation is being conducted for a legitimate purpose; (2) the inquiry is relevant to that purpose; (3) the information sought is not already in the possession of the IRS; and (4) the administrative steps required by the Internal Revenue Code have been followed.

*Id.* at 680.

The second prong of this test requires only a showing of "potential relevance."  *United States v. Arthur Young & Co.*, 465 U.S. 805, 814-16 (1984).  This standard is met if the documents sought "may be relevant or material" and does not require relevance in the "technical, evidentiary sense."  *Id.* (also declining to find any exceptions beyond traditional privileges and limitations absent unambiguous direction from Congress).

The Government's initial burden in opposing a petition to quash or seeking to compel compliance is only "'slight or minimal'" and may be satisfied by presenting "'an affidavit of an agent involved in the investigation averring the *Powell* good faith elements'" have been satisfied.  *Conner*, 434 F.3d at 680 (quoting *Mazurek v. United States*, 271 F.3d 226, 230 (5th Cir. 2001); *Alphin v. United States,* 809 F.2d 236, 238 (4th Cir. 1987)).  If the Government meets this burden, it is entitled to enforcement of the summonses unless the taxpayer proves the elements are not satisfied or otherwise shows "the IRS is attempting to abuse the court's process."  *Conner*, 434 F.3d at 680 (noting abuse would include issuing the summons "for an improper purpose such as to harass the taxpayer or to put pressure on him to settle a collateral dispute."); *id.* at 681 (stating "[b]ecause the government has already produced [the IRS agent's] affidavit disavowing possession of the documents sought . . . , Conner bore the burden of proving otherwise").

## BACKGROUND

**BST Formation and Operations.**  BST was incorporated as a nonprofit entity in the State of Georgia in 1972 and maintains its headquarters in Spartanburg, South Carolina.  *See* Georgia

4

Corporations Division Business Search Record, ECF No. 13-1; ECF No. 13 at 1-2 (Petitioner's "Statement of Pertinent Facts"). BST was originally formed by Dr. Freda Crews and her husband, Dr. William Crews. ECF No. 13 at 1-2 (relying on BST's website in providing historical information). In its early years, BST's primary function was to produce and broadcast a weekly radio program hosted by Dr. William Crews. *Id.* From 1991 through 1997, Dr. Freda Crews ("Dr. Crews"), also hosted a weekly radio program. *Id.* At some point, Dr. Crews began hosting a weekly television program, "Time for Hope," which is a "faith-based mental health talk and interview show" that includes "related biblical teaching." *Id.* at 2.

Dr. Crews, an ordained minister, has been a member of BST's Board of Directors since BST's inception and has served at its president and chief executive officer since 2009. Dr. Freda Crews Declaration ¶¶ 3, 5 ("Dr. Crews Decl."), ECF No. 13-2. Her son, William Crews, Jr. ("William Crews"), has served as BST's treasurer since 2009 and its secretary/treasurer since 2011. William Crews Declaration ("W. Crews Decl."), ECF No. 13-3. William Crews' duties for BST include "negotiating reduced media rates for the various religious, faith-based organizations served by [BST]." *Id.* ¶ 4 (indicating he has performed this duty since April 2009).

Dr. Crews avers that, beginning in 2008, she began periodically holding worship services as "Pastor of the Hope for Living Media Church." ECF No. 13-2 ¶ 6. She states the services (1) are held on Monday mornings, (2) "are open to the public and attended by all employees at Bible Study Time, Inc.," (3) have been held on a "regular, consistent, weekly basis since 2010," and (4) include "worship with spiritual songs and hymns, biblical teaching, prayer, and specific prayers for the viewers of the Hope for Living Media Church pursuant to their written prayer requests." *Id.* There is no indication the worship services are broadcast. Neither is there any indication the name "Hope for Living Media Church" is used to identify BST as a whole, Dr. Crews' television

5

program ("Time for Hope"), or the fee-negotiating services provided by William Crews (apparently provided under the name "Select Religious Broadcasting Service" and accounting for the vast majority of BST's receipts, *see* BST 2013 Form 990 (reflecting "program service revenue" of $1,723,485 and total revenue of $2,397,529).[3]

**IRS Communications with BST in 2012-13.** In August 2012, Revenue Agent Russell Gagnon ("Agent Gagnon") notified BST by letter that BST had been selected for an audit for the tax year ended December 31, 2010 ("2010 Tax Year"). Agent Gagnon First Declaration ¶¶ 2, 4, ECF No. 8-1 ("Gagnon First Decl."). BST's return for the 2010 Tax Year was made on Form 990 ("BST 2010 Form 990"). *Id.* ¶ 2. Although Form 990 (titled "Return of Organization Exempt from Income Tax") includes a block allowing the filer to indicate it is a church, BST did not mark this block on its 2010 Form 990. *Id.* ¶¶ 3, 7. Neither had BST claimed church status prior to notification of this audit. *Id.* ¶ 7 (noting BST's first claim of church status was made in a letter faxed to the IRS on November 7, 2012).

Agent Gagnon's letter requested a field examination on September 10, 2012. *Id.* ¶ 4. BST responded by designating Donald E, Guinn ("Guinn"), a certified public accountant ("CPA"), as its representative. *Id.* ¶ 5. Guinn called Agent Gagnon on September 5, 2012, confirming the September 10, 2012 appointment. *Id.* However, when Agent Gagnon arrived at BST's location to conduct the field examination, Guinn informed him (by telephone) that Guinn would not allow

---

[3] The earliest cited reference to the name "Hope for Living Media Church" is in a letter written on BST's behalf on March 26, 2015, that characterizes the name as a "doing business as" name under which Dr. Crews conducts worship services. *See* ECF No. 13-5 (discussed below). ECF No. 13-5. This letter and Dr. Crews' Declaration are the only support offered for the claim any part of BST's activities constitute operation as a church.

the examination to proceed at that time.[4]  The examination was rescheduled to November 13, 2012, a date Guinn confirmed by voicemail in early October.  *Id.* ¶ 6.

On November 7, 2012, roughly a week before the date set for the rescheduled examination, Guinn faxed a letter to Gagnon asserting BST was claiming church status for purposes of its 2010 taxes.  *Id.* ¶ 7.  Following receipt of this letter, Agent Gagnon initiated procedures to determine whether to authorize a church tax inquiry.  *Id.* ¶ 9.  The inquiry was not, however, pursued due to the applicable limitations period.  *Id.*  BST's 2010 Form 990 was, therefore, accepted as final.  *Id.* ¶ 10.

BST was informed of the acceptance of its 2010 Form 990 by letter dated December 2, 2013.  ECF No. 1-15.  The letter included the following explanation:  "After further considering the information return for [Tax Year 2010], we have accepted the return as filed.  *We did not conduct an examination for the above period.  Do not consider this an examination that resulted in no change to your tax exempt status.*"  *Id.* (emphasis added).

Despite claiming church status for the 2010 Tax Year, BST did not amend its 2010 Form 990 or mark the appropriate box to claim church status on its Form 990 for Tax Years 2011-2013, at least two of which were filed after Guinn claimed church status on BST's behalf in November 2012.  Gagnon First Decl. ¶ 11.  Further, while BST's description of its exempt function in its 2013 Form 990 indicated a religious purpose, it did not suggest BST was conducting religious services or otherwise operating as a church.  *See* ECF No. 8-1 at 8, 9 (describing "primary exempt

---

[4]  Correspondence in the record indicates Guinn's office is located in Irving, Texas.  *See* ECF No. 13-5 (letter dated March 26, 2015); ECF No. 13-10 (letter dated June 29, 2016).

function [as] to spread the Gospel through TV & radio programs, counseling services[,] religious tapes and books, speaking engagements [and] seminars." (capitalization modified)).

**Notice of Audit of BST 2013 Form 990.** In February 2015, the IRS, through Agent Gagnon, advised BST that its 2013 Form 990 had been selected for audit. ECF No. 13-6 (Letter dated February 25, 2015). The notice letter sought to schedule a field audit on April 14, 2015. *Id.* It attached IRS Publication 1, which included notice that the IRS might contact third parties, and a Form 4564 ("Information Document Request"). *Id.*; Gagnon First Decl. ¶ 16. The Form 4564 sought documentation as to employee compensation (most critically as to Dr. Freda Crews), sources of BST's income, and information relating to real property owned or leased by BST. ECF No. 13-6 at 4-5. [5]

---

[5] BST's 2013 Form 990 indicates Dr. Crews was paid $371,445 in "reportable compensation" plus an additional $48,000 in "other compensation," described as a parsonage allowance. ECF No. 8-1 at 14, 35, 36. It also indicates William Crews, the next highest paid employee, received compensation of $125,596, consisting of a base salary and "commission income based on a fixed percentage of broadcast placement revenue." *Id.* at 14, 36. BST's 2013 Form 990 lists a single director (Dean Anderson) whose compensation is listed as $54,399, indicates BST had a total of 14 employees, and discloses a total salary, compensation, and benefits expense of $899,468. *Id.* at 8, 12, 14.

BST's disclosed sources of income included $31,202 in contributions and grants, $1,723,485 in "program service revenue" (later described as income from "religious broadcast placement," the function for which William Crews was paid a commission) and $667,902 in investment income. *Id.* at 8, 16. Total income, after accounting for a negative income source, is reported as $2,397,529.

Under "Statement of Program Service Accomplishments" (Part III), BST describes its mission as follows: "The ministry's primary exempt function is to spread the Gospel through TV & radio programs, counseling services, religious tapes & books, speaking engagements, seminars." *Id.* at 9. In response to a directive to "[d]escribe [its] program service accomplishments for each of its three largest program services, as measured by expenses[,]" BST discloses expenses of $814,281, including grants of $29,618, and provides the following explanation: "The ministry's purpose is achieved by making contributions to other charitable organizations whose mission is the same as that of [BST]. These organizations also spread the Gospel through personal witness,

8

BST responded to this notice through Guinn, who called Agent Gagnon on or about March 18, 2015, taking the position BST was a church in 2013. Gagnon First Decl. ¶ 18. Guinn repeated this position in a follow up letter dated March 30, 2015. *Id.*; ECF No. 13-5. In this letter, Guinn noted BST previously claimed church status on November 7, 2012, in response to an audit of BST's 2010 Form 990, after which the IRS "accepted the 2010 Form 990 return as filed." ECF No. 13-5 at 2. Guinn stated that, after receiving the Notice of Audit for the 2013 Form 990, BST "again evaluated [its] operations" and determined BST had "continued to evolve into even more of a traditional church[,]" including "conduct[ing] weekly praise and worship services." *Id.* Guinn concluded BST was "again formally asserting its church claim" and would "exercise all of its rights under Internal Revenue Code Section 7611." *Id.*

After receiving this letter, Agent Gagnon initiated procedures to determine whether to authorize a church tax inquiry. Gagnon First Decl. ¶ 20. On June 15, 2016 (roughly 15 months after BST asserted its claim of church status for the 2013 Tax Year), the IRS sent BST a notice of church tax inquiry. *Id.* ¶ 21; ECF No. 13-9. That letter listed four areas of concern including: (1) whether BST had engaged in excess benefit transactions with disqualified persons (identifying "the amount of Freda Crews' compensation" as primary concern); (2) whether BST had received unrelated (and unreported) business income (identifying possible location of SkyMaster Center, Inc. ("SkyMaster"), a for-profit corporation owned by William Crews, on property owned by BST and BST ownership of a parking lot as concerns); (3) whether all compensation was properly reported on W2s (referring back to the first concern); and (4) whether BST's recent claim of church

_____

publications and service to others in need[.] The primary mission of [BST] is to spread the Gospel through broadcast of religious programming." *Id.*

status was warranted, particularly given BST received more than 75% of its gross receipts from program services and had not claimed church status on Form 990s filed after its earlier claim of church status for the 2010 Tax Year. ECF No. 13-9. This letter was signed by Tamera Ripperda, ("Ripperda") Director, Exempt Organizations ("DEO"). *Id.* at 4. A Notice 729, Statement of Administrative and Constitutional Rights, and twenty questions about BST's operations were attached to Ripperda's letter. *Id.* The first nine questions inquired into BST's church-related activities (*e.g.*, conduct of religious services and ceremonies such as baptisms and weddings, production of church literature, place of worship, size and composition of congregation). The tenth question sought costs of and revenues from BST's television program "Time for Hope." The next six questions addressed excess benefit transaction concerns, focusing on Dr. Crews' compensation. The remaining questions sought information on how BST distinguished between church and non-church expenses, the nature of BST's reported $610,000 in "other assets," the relationship between SkyMaster and BST, and BST's apparent ownership of a parking lot. *Id.* at 6-7.

BST did not respond to these queries. It instead took the position Ripperda could not authorize the inquiry because her position as DEO was not sufficiently highly-placed to satisfy the statutory requirements for initiation of a church tax inquiry. ECF No. 13-10 (Guinn letter dated June 29, 2016, relying on *United States v. Living Word Christian Center,* 2009 WL 250049 (D. Minn. 2009)).

The IRS again wrote BST on August 4, 2016, explaining why it believed *Living Word Christian Center* did not control. ECF No. 13-11 (explaining Ripperda's position as DEO was one step higher than the position addressed in that case). BST responded through counsel on August 9, 2016, maintaining its position Ripperda could not authorize a church tax inquiry. ECF No. 13-

10

12. BST's attorney also characterized the inquiry as improper in light of what he characterized as "repeated inquiries" in "2012, 2013, 2015 and now 2016." *Id.* at 3.

On September 1, 2016, the IRS wrote Guinn summarizing the prior communications and stating "because you did not provide the information we requested, we still think an examination of the organization's books and records may be necessary." ECF No. 13-13 at 3. This letter identified the same concerns previously noted (possible excess benefit transactions, receipt of unrelated business income, failure to report all compensation, and recent claim of church status). It advised BST of its right to seek a conference before any examination and listed a variety of documents, noting the documents did not need to be produced at that time. Instead, the document list was provided "to advise [BST] of what [the IRS] may seek to examine so that they may be a topic of discussion if you request a conference." *Id.* at 3; *see also id.* at 4 (indicating IRS would seek the examination if it did not hear from BST within 15 days). The Government states and BST does not contest that BST "did not comply with the examination." ECF No. 8 at 4.

Rather than further pursuing a church tax examination, the IRS issued summonses to the Banks on October 17 and 18, 2016. Each of the eight summonses seeks records of BST's bank accounts for the year ending December 31, 2013, and specifies November 14, 2016, as the response date. ECF Nos. 1-1 through 1-8. The IRS sent BST notices of the summonses by certified mail on the same day the summonses were issued. Gagnon First Decl. ¶¶ 26, 27 (referring to Exhibits 2 and 3, though no such exhibits are attached). BST filed its petition to quash the eight summonses on November 3, 2016.

The Government responded by moving to dismiss the petition. The motion to dismiss is supported by Agent Gagnon's First Declaration, which identifies a number of the concerns listed in his and Ripperda's earlier communications with BST. Agent Gagnon notes, for example: (1)

11

BST asserted it achieved its exempt purpose by making contributions to other charitable organizations yet reported contributions of only 1.5% of its total expenditures; (2) BST failed to disclose business transactions with interested persons while the IRS had reason to believe William Crews' business, SkyMaster, was co-located with BST; (3) BST owned a residence the IRS believed was being used by Dr. Crews while she was receiving a parsonage allowance; and (4) BST reported having only one independent director during 2013 but referred to compensation decisions being made by independent board member<u>s</u> (plural)).  Gagnon First Decl. ¶¶ 30-36.

BST filed an opposition memorandum supported by declarations from Dr. Crews, William Crews, and Wendy Jolley Sailor (an employee in BST's "accounting department").  These declarations address concerns noted in Agent Gagnon's First Declaration.  For example, Dr. Crews denies that she is or was living in a house owned by BST and points to public records that she maintains demonstrate her ownership (through a revocable trust) of the home in which she resides.  Dr. Crews Decl. ¶¶ 4, 7.[6]  Dr. Crews also explains BST had one independent board member for twenty-one of the past twenty-three years, the exception being from May 2011 through 2013, during which period no changes in officer compensation were made.  *Id.* ¶¶ 9, 10.  Dr. Crews also provided information about worship services she conducts and other information relating to her role with BST.  *See supra* at 4, Background, BST Formation and Operations.

William Crews describes his role at BST, noting he serves as secretary-treasurer and negotiates reduced media rates for organizations served by BST.  William Crews Decl. ¶ 3, 4.  He

---

[6]  BST argues the public record of ownership together with the address reflected on Dr. Crews' personal income tax return demonstrates she did not reside in a home owned by BST during the 2013 Tax Year.

explains SkyMaster is a separate business entity he operates on his own time and has a separate address listed with the Secretary of State. *Id.* ¶¶ 5-7. He, nonetheless, concedes he has received SkyMaster mail at the BST address. *Id.* ¶ 8.

Ms. Sailor provides some financial information, explaining BST "spent over $611,138" in 2013 "to broadcast its own religious programming." Sailor Decl. ¶ 4. She also avers BST "saved a variety of other charitable ministries slightly less than $3,000,000 by negotiating deductions in broadcast rates." *Id.* ¶ 5 (presumably referring to the services provided by William Crews, payment for which accounts for a large portion of BST's receipts according to its 2013 Form 990 (reflecting "program service revenue" of $1,723,485 compared to total revenue of $2,397,529).

The Government filed a reply in support of dismissal, attaching a supplemental declaration by Agent Gagnon ("Gagnon Second Decl."). Agent Gagnon explains the bases of his original concerns as well as concerns that remain after consideration of the three declarations submitted by BST. For example, he notes conflicting evidence as to SkyMaster's address, including that an attempt to serve legal papers on SkyMaster using the address William Crews identifies as its proper address failed, but was successful when using BST's address. Gagnon Second Decl. ¶ 2 (ECF No. 14-2). Agent Gagnon acknowledges and appears to accept Dr. Crews' explanation as to her residence, but explains the legitimacy of his earlier-stated concerns based on BST's ownership of a residence that it lists as a library. *Id.* ¶ 3.

### DISCUSSION

The court first considers whether the Government has made a prima facie showing in support of its motion to dismiss and in opposition to BST's Petition. To make this showing, the Government must proffer evidence in support of each of the four prongs of the *Powell* test. The court finds the Government has met this threshold burden through Agent Gagnon's First

Declaration. Specifically, the court finds as follows: (1) the summonses were issued for a legitimate purpose because information reported in BST's 2013 Form 990 and otherwise available to the IRS at the time the summonses were issued raises questions as to whether BST was operating for an exempt purpose (whether as a church or other exempt organization) in 2013, whether BST engaged in excess benefit transactions with disqualified persons during that period, and whether it has received unrelated and unreported business income; (2) the information sought through the summonses is relevant to this legitimate purpose because the information sought will show BST's cash flow, which is likely to shed light on at least two of the stated concerns[7]; (3) the information is not already in the possession of the IRS, as there is no indication it has more than the conclusory financial information provided in the 2013 Form 990; and (4) the administrative steps required by Sections 7602 and 7609 were followed.

This shifts the burden to BST to establish the Government has not satisfied at least one of the *Powell* prongs or to otherwise establish bad faith. BST's arguments in opposition are addressed below.[8]

## I. Alleged Defect in Authorization of the Underlying Church Inquiry or Examination

BST's first argument, both in its Petition and in response to the Government's motion to dismiss, is the third-party summonses are invalid because they were issued "in connection with an

---

[7] Though they may reveal information relevant to BST's claimed church status or other basis for tax exempt status, the bank records are more likely to reflect whether BST has engaged in prohibited excess benefit transactions or received unrelated and unreported business income.

[8] As noted above, BST raised four arguments in its petition to quash the summonses. BST's response to the Government's motion to dismiss is more narrowly focused, appearing to abandon some of its initial arguments. The discussion below, nonetheless, addresses arguments advanced in BST's petition and in opposition to the Government's motion.

improperly authorized and illegitimate church tax inquiry and examination of BST[.]"  ECF No. 1 at 1; *see also* ECF No. 13 at 5 (arguing "government must prove that the IRS violations of the safeguards in 26 U.S.C. § 7611 do not bar the summonses as a matter of law"); *id.* at 6-9 (arguing Government failed to comply with § 7611).  BST argues the improper authorization of the underlying church tax inquiry and examination render the third-party summonses per se defective and also preclude a finding of good faith under *Powell.*  This argument appears to challenge the purpose of the investigation (first *Powell* prong) and compliance with administrative steps (fourth *Powell* prong).  For reasons explained below, the argument fails as a matter of law.

BST's argument presumes (1) the IRS improperly initiated the church tax inquiry and examination and (2) third-party summonses issued for the purpose of investigating tax liability or status of an entity claiming to be a church are valid only if there is an underlying, validly authorized church tax inquiry or examination.

Avoiding what appears to be an unsettled legal question, the Government does not address BST's argument that the church tax inquiry and examination were improperly authorized beyond noting its position authorization was proper.  The Government, instead, argues Section 7611 has no application to third-party summonses because third-party summonses are governed solely by Section 7609.  The court agrees for reasons explained below.

Section 7611 defines "church tax inquiry" as "any inquiry *to a church* (other than an examination) to serve as a basis for determining" whether the church is exempt from tax due to its status as a church or is subject to taxation for some other reason (*e.g.*, because it is "carrying on an unrelated trade or business").  26 U.S.C. § 7611(h)(2) (emphasis added).  Procedures for initiating church tax inquiries are addressed in Section 7611(a).  Section 7611 defines "church tax examination" as "any examination for [the same purposes] *of (A) Church Records* at the request

15

of the [IRS], or (B) the religious activities of any church."  26 U.S.C. § 7611(h)(3) (emphasis

added).  "Church Records" is defined to *exclude* records acquired "pursuant to a summons to which

Section 7609 applies[.]"  26 U.S.C. § 7611(h)(4).  Thus, church tax inquiries and church tax

examinations are two distinct investigatory "tools" used for the same purpose and are directed *to*

the church or *to* records in the church's custody (as opposed to church-related records held by a

third party).[9]

Presumably because church examinations are more intrusive, Section 7611 provides that a

church must be offered a conference before a church tax examination is conducted.  26 U.S.C. §

7611(b)(1).  Church records and activities may, moreover, only be examined "to the extent

necessary to determine" liability for tax or whether the entity was, in fact, operating as a church

during the relevant period.  *Id.*; *see also United States v. C.E. Hobbs Foundation for Religious

Training and Education, Inc.*, 7 F.3d 169 (9th Cir. 1993) (distinguishing between low relevance

standard applied to third-party summonses and higher necessity standard applied where records

are sought from a church); *United States v. Church of Scientology of Boston, Inc.*, 933 F.2d 1074,

1076 (1st Cir. 1991) (same).

---

[9] The Government characterizes a church tax inquiry and a church tax examination as "tools" used
in investigating a church and its potential tax liability and a third-party summons as a distinct tool
the validity of which does not turn on whether there is a properly authorized underlying church tax
inquiry or examination.  While BST does not challenge the characterization of church tax inquiries
and examinations as tools, it refers to them as subparts of a "church investigation," and argues, in
effect, that other tools (*e.g.*, third-party summonses) used to investigate a church are valid only if
there is a properly authorized church investigation.  Section 7611 does not, however, use the term
"church investigation."

Third-party summonses are governed by Section 7609, not Section 7611, even when the summons is issued in connection with a church tax inquiry. *Hobbs Foundation*, 7 F.3d at 173 (relying on applicability of Section 7609 in holding IRS need only show relevance, not the higher necessity required under Section 7611, to obtain records from a third-party that relate to tax liability of an entity claiming church status).[10] This is consistent both with the language of Section 7609 (a section expressly directed to third-party summonses) and Section 7611's exclusion of "records acquired 'pursuant to a summons to which Section 7609 applies'" from the definition of "church records." 26 U.S.C. § 7611(h)(4).

Legislative history confirms that Section 7611 is inapplicable to third-party summonses. Section 7611 was added to the Internal Revenue Code as part of the Deficit Reduction Act of 1984. PL 98-369 (HR 4170), July 18, 1984, 98 Stat 494. The House Conference report at that time stated the "church audit procedures" did not apply to examination of the types of third-party records sought here, explaining as follows:

> Records held by third parties (e.g., cancelled checks or other records in the possession of a bank) are not considered church records for purposes of the conference agreement. Thus, subject to the general code provisions regarding third party summonses, the IRS is permitted access to such records without regard to the requirements of the church audit procedures (sec. 7609). As under present law, either the IRS or a third party recordkeeper generally is required, however, to inform a church of any requests for materials.

H.R. CONF. REP. 98-861, at 1106 (1986), *reprinted in* 1984 U.S.C.C.A.N. 1445, 1794.

---

[10] In *Hobbs Foundation*, the court upheld a summons issued to the Foundation as well as a summons issued to a bank for records relating to the Foundation's accounts. The court analyzed the summons issued to the Foundation under Section 7611 and the necessity standard because the Foundation claimed church status. It analyzed the summons issued to the bank under Section 7609 and the lower relevance standard.

As BST argues, a third-party normally has little motivation to refuse to comply with an IRS summons for records relating to another taxpayer, making it unlikely any challenge to a third-party summons would arise in the context addressed by Section 7611(e)(1): a proceeding to compel compliance with the summons. BST relies on the unlikeliness of this scenario to argue Section 7611(e) should be read to allow an entity claiming church status to raise defects covered by Section 7611(e)(1) in the context of a petition to quash. This argument is unpersuasive because it ignores the express exclusivity of the remedy as stated in Section 7611(e)(2).[11] In contrast, the absence of a reference to petitions to quash under Section 7611(e)(1) is consistent with an interpretation of Section 7611 to control only records requests directed to the entity claiming church status. Notably, Section 7609 not only allows for but facilitates petitions to quash by, inter alia, requiring the IRS give the taxpayer notice of the summons sufficiently in advance of the response date to allow the taxpayer to challenge the summons.

BST's arguments relating to Section 7611 and the alleged defect in the IRS's institution of a church tax inquiry and examination fail to raise a plausible inference the third-party summonses were issued for an illegitimate purpose or reflect an attempt by the IRS to abuse the court's process.

---

[11] Section 7611(e) provides only for a stay of "any proceeding to *compel compliance* with any summons with respect to [a church tax] inquiry or examination" until "all practicable steps to correct the noncompliance have been taken." 26 U.S.C. § 7611(e)(1). This remedy is made exclusive by Section 7611(e)(2) which provides "[n]o suit may be maintained, and no defense may be raised in any proceeding (other than as provided in paragraph (1)), by reason of any noncompliance by the Secretary with the requirements of this section." 26 U.S.C. § 7611(e)(2) (providing for exclusivity of remedy); *see also Music Square Church v. United States*, 218 F.3d 1367 (Fed. Cir. 2000) (relying on statutory language and legislative history in finding "no doubt that Congress intended for remedies for violations of the procedural requirements of [Section 7611] to be strictly limited").

*Conner*, 434 F.3d at 680.  It follows that these arguments do not support quashing the summonses. BST's other arguments are addressed below.

## II.     IRS's Alleged Possession of Information

BST's second argument, as presented in its petition, rests on a claim the IRS already has at least some of the information it seeks through the summonses.  *See* ECF No. 1 at 8 ("as a result of the IRS' shotgun approach to the summonses, the information sought in some or all of the summonses issued to the Banks is information already revealed in the Form 990 filed by BST[.]"). This argument challenges the third prong of the *Powell* test.

BST does not directly advance this argument in opposition to the Government's motion to dismiss, though it does argue some concerns raised by the Government might be resolved by *other research*.  While some of the concerns noted in Gagnon's First and Second Declaration may be addressed, at least in part, by information the IRS could obtain from other sources (without seeking bank records), legitimate concerns would remain.  The availability of information from other sources does not, in any event, support the premise the IRS *already has* the relevant information.[12]

There is no evidence the IRS already has either the records it is seeking from the Banks or their equivalent.  The evidence, instead, indicates the IRS has only the limited and conclusory financial information reflected in BST's 2013 Form 990.  BST has, therefore, failed to raise a plausible inference that would warrant quashing the summonses on grounds the IRS already has the information it seeks.

---

[12]  The records sought from the Banks are clearly relevant (*Powell* second prong) to the legitimate purpose (*Powell* first prong) as they will show the flow of money into and out of BST, which, in turn, is likely to shed light on the concerns noted in Gagnon's Declarations.

### III.    IRS's Alleged Failure to Provide Proper Notice

BST's third argument asserts the summonses are invalid because the IRS failed to provide proper notice that it might seek information from third parties.  This argument relies on the general notice provision found in 26 U.S.C. § 7602(c)(1), which require the IRS to provide "reasonable notice in advance to the taxpayer that contacts with persons other than the taxpayer may be made." BST does not challenge the IRS's compliance with the specific notice provisions of Section 7609.

In making this argument, BST focuses on the September 1, 2016 Notice of Church Tax Examination Letter which was accompanied by an Information Document Request but did not advise of the IRS's possible contact with third parties..  ECF No. 1 at 8-9 (citing ECF No. 1-14). The IRS responds that it gave the general notice required by Section 7602 though IRS Publication 1, attached to Gagnon's first letter advising BST that its 2013 Form 990 had been selected for an audit.  ECF No. 13-1 (Gagnon letter dated February 25, 2015); Gagnon First Decl. ¶ 16.  As BST notes, Publication 1 advises taxpayers the IRS may "sometimes talk with other persons if we need information that you have been unable to provide[.] . . . Our need to contact other persons may continue as long as there is activity in your case."  ECF No. 13 at 18, 19 n. 15 (quoting Publication 1).  BST argues this notice was both too general and given too far in advance of the contact to satisfy the requirements of Section 7602.  *Id*. at 17, 18.  BST seeks to distinguish the line of cases on which the Government relies by noting it received Publication 1 sixteen months before Ripperda advised BST she was authorizing a church tax inquiry, while the line of cases cited by

the Government involved gaps in time of six days to ten months. [13]   BST also notes one court has

held the notice in Publication 1 inadequate to satisfy Section 7602.  *Id.* at 18, 19 (citing *Baxter v.*

*United States*, C.A. No. 15-cv-04764-YGR, 2016 WL 468034, at *2 (N.D. Ca. Feb, 8, 2016)

(holding generic notice in Publication 1 insufficient prior notice in addressing challenge to notice

of third-party summons).

      The court finds the notice provided through Publication 1 adequate, at least in the context

of the contact at issue in this petition:  issuance of summonses pursuant to and in full compliance

with the notice provisions of Section 7609.  *See generally Wood v. United States*, No. JKB-15-

3311, 2016 WL 3027530 at *4 n. 10 (D. Md. 2016) (addressing relationship between notice

required under Sections 7602(c)(1) and 7609(a) and citing cases holding notice provided under

Section 7609(a) satisfies notice requirement of Section 7602(c)(1) as well as cases finding notice

in Publication 1 satisfies general notice requirement of Section 7602(c)(1)).[14]   Publication 1

notified BST of possible future contact with third parties.  While there was a substantial delay

between BST's receipt of Publication 1 and issuance of the summonses, that delay was primarily

the result of BST's intervening assertion of church status, which caused the IRS to pursue steps

necessary to initiate a church tax inquiry or examination.  BST would reasonably have understood

this process required time and involved continued "activity in [its] case."  Certainly BST

understood activity continued in its case between the time it received notification Ripperda had

---

[13]  BST also hints that it may not have received Publication 1 by noting the Publication was not
attached to the letter *forwarded to its counsel* (presumably by BST).  BST does not, however, deny
that it received the publication.  *See* ECF No. 13 at 3 n.3, 17 n.12.

[14]  The court recognizes *Baxter* reached the opposite conclusion under similar circumstances, but
finds the cases cited in *Wood* persuasive.

authorized (or at least purported to authorize) a church tax inquiry (and subsequent examination) and issuance of the summonses.  BST also received contemporaneous notice the IRS was issuing summonses to the Banks and, pursuant to the specific notice provisions of Section 7609, was afforded (and took advantage of) the opportunity to challenge the contact before the IRS received any response from the Banks.  Thus, both the letter and spirit of Section 7602(c)'s notice provision were satisfied by the general notice provided through Publication 1 and specific notice provided through contemporaneous notice that the summonses were issued.

## IV.     Alleged Illegitimate Purpose

BST's last argument, as presented in its petition to quash, is the summonses were issued for the purpose of harassing BST and, more specifically, that they violated Section 7611(f) because they were part of a successive inquiry begun within a five year period.  Both arguments fail for reasons explained below.

### A.     Alleged Improper Successive Inquiry

In its petition to quash, BST alleges "[d]uring [its] four-year tenure as a church, which was recognized by the IRS in 2015, [BST] has been subject to no fewer than four audit examination inquiries or church tax inquiries, none of which have resulted in any adverse outcome for BST." ECF No. 1 at 3; *see also* ECF No. 1 at 9, 10 (asserting "IRS conducted inquiries of BST in 2012, 2013, 2015 and now 2016" and arguing summonses cannot serve a legitimate purpose because they "continue the IRS's repeated and ongoing harassment of BST").  BST asserts these multiple "inquiries" violate Section 7611(f), which provides, in part, as follows:

> If any church tax inquiry or examination with respect to any church is completed and does not result in [a listed adverse consequence] no other church tax inquiry or examination may begin with respect to such church during the applicable 5-year period unless such inquiry or examination is approved in writing by the Secretary

or dos not involve the same or similar issues involved in the preceding inquiry or examination.

26 U.S.C. § 7611(f)(1).

BST does not appear to advance this argument in responding the Government's motion to dismiss. Were it to do so, its argument would fail as it depends on a mischaracterization of events.

The record, including documents BST attached to its petition, reveals that what BST characterizes as an "inquiry" in 2012 consisted of an announced audit of BST's 2010 Form 990, which form did not claim church status. Gagnon First Decl. ¶¶ 2-4. This audit was not pursued or converted to a church tax inquiry after BST claimed church status (the only form of "inquiry" to which Section 7611(f)(1)'s prohibition applies). Gagnon First Decl. ¶¶ 2-10. What BST refers to as an "inquiry" in 2013 appears to refer to the 2013 letter advising BST that its 2010 Form 990 would be accepted as filed. This letter cannot be characterized as an inquiry even in a general sense, much less as a church tax inquiry. The letter, instead, explained that no church tax inquiry had been instituted: "After further considering the information return for [Tax Year 2010], we have accepted the return as filed. *We did not conduct an examination for the above period. Do not consider this an examination that resulted in no change to your tax exempt status.*" ECF No. 1-15 (emphasis added).[15] Thus, nothing in the IRS's 2012 and 2013 communications with BST may fairly be construed or characterized as a prior church tax inquiry or examination.

The IRS's next communication, in February 2015, announced an audit of BST's 2013 Form 990, which, like BST's 2010 Form 990, did not claim church status. As in response to the 2012

---

[15] Given that this Form 990 did not claim church status (and was never updated), it also cannot fairly be characterized as recognizing BST's claim of church status.

audit of its 2010 Form 990, BST responded by asserting church status. This claim did culminate in the IRS's pursuit of a church tax inquiry and, when BST declined to respond to that inquiry, church tax examination (both "authorized" by Ripperda as stated in correspondence dated in 2016). BST has declined to respond to either based on legal arguments Ripperda, as DEO, has too low a rank to authorize either a church tax inquiry or investigation. Whether or not properly authorized, BST cannot reasonably maintain that the IRS's communications in 2015 (relating to an audit of a Form 990 that did not claim church status) or 2016 (purporting to authorize a church tax inquiry and investigation) evidence a *completed* inquiry or examination (with or without favorable results). Rather, they represent either an inquiry and examination that were never initiated due to a procedural defect (BST's position in other arguments) or that remain open, though languishing due to BST's refusal to participate and the Government's decision to utilize other investigatory tools rather than seeking to compel compliance with the examination. Accordingly, this argument does not raise a plausible inference of successive inquiries in violation of Section 7611(f).

**B.  Alleged Harassment**

BST's fourth argument also fails to the extent it asserts the summonses were not issued for a legitimate purpose because they were intended to harass BST or to coerce it into responding to an improperly instituted church tax inquiry or examination. ECF No. 1 at 1. BST offers no evidence either of an intent to harass or to coerce BST to respond to the church tax inquiry or examination. There is, for example, no indication the IRS has offered not to pursue the summonses if BST agrees to provide substantive responses to the church tax inquiry or allow examination of records in BST's possession. Neither does BST offer any support for this premise in its memorandum in opposition to the Government's motion to dismiss. It, instead, appears to abandon this argument in favor of an argument Agent Gagnon has "misrepresent[ed] numerous facts" in

24

support of the summonses.  ECF No. 13 at 10.  This argument is addressed below.  Discussion §
IV.C.

At most, BST's evidence and argument demonstrates the IRS (1) elected to pursue third-party summonses as an alternative means of obtaining information it might have obtained from BST by seeking to compel responses to its church tax inquiry and examination; and (2) it did so because Ripperda's authority to initiate a church tax inquiry and examination was subject to legal challenge.  The first proposition appears to be correct and the second is at least a reasonable conclusion the court accepts for purposes of the present petition.  This does not, however, draw the legitimacy of the Government's purpose in issuing the summonses into question unless reliance on a third-party summons is improper – an argument rejected above (Discussion § I).

### C.     Alleged Misrepresentation of Facts

This leaves BST's argument Agent Gagnon's First Declaration "misrepresents numerous facts," which argument is proffered in opposition to the Government's motion to dismiss.  ECF No. 13 at 10.  This argument, presumably, challenges the Government's proof of the first prong of the *Powell* test (legitimate purpose).  BST's supporting arguments do not, however, point to a single "misrepresentation."  They, instead, point to possible innocent explanations for a number of the concerns noted by Agent Gagnon.

For example, BST asserts it did not include all of its expenditures in furtherance of its mission because of limited space, noting, in particular, that while it disclosed a single expenditure (contributions to other organizations) that amounted to only 1.5% of its total expenditures, it omitted a much larger expenditure to broadcast its own program ($611,138).  BST supports this point with Sailor's declaration testimony.  While this and similar information might, ultimately, resolve concerns raised by the IRS, it does not cast doubt on the legitimacy of the initial concerns

25

expressed in Agent Gagnon's First Declaration.  Indeed, BST's reliance on a declaration to provide the information is consistent with the view some inquiry to BST was necessary and appropriate to resolve concerns noted by Agent Gagnon.

Similarly, BST proffers William Crews' declaration to explain his role at BST and SkyMaster.  He avers SkyMaster had its own address and did not operate from BST, though he concedes he sometimes received SkyMaster mail at BST's address.  While this may partially address a concern Agent Gagnon noted in his First Declaration, it does not point to any "misrepresentation" in that declaration.  It, instead, confirms one basis for Agent Gagnon's concern, that SkyMaster was using the BST address at least for some purposes.  Further, Agent Gagnon's Second Declaration notes additional evidence of a more consistent usage of the BST address than William Crews suggests.  Most critically, Gagnon proffers evidence legal mail that could not be delivered to SkyMaster at its "official" address was ultimately accepted on behalf of SkyMaster at BST's address by a BST employee.  While this information does not establish that SkyMaster utilizes the same address or facilities as BST, it does support the continued existence of legitimate concerns as to the relationship between SkyMaster and BST.

Dr. Crews' explanation as to her residence may resolve one of Agent Gagnon's initially stated concerns.  It is also possible, as BST argues, that the IRS could have obtained the same information from other sources (*i.e.* by examining public records for ownership of the home whose address Dr. Crews lists on her personal income tax return).  This does not, however, cast doubt on the existence of genuine questions at the time the summonses were issued and at the time Agent Gagnon signed his First Declaration.  Further, as explained in Agent Gagnon's Second Declaration, it remains that BST owns a residential building that is listed as a library.  The actual usage is a legitimate area of inquiry.

26

### D.    Alleged Need for Discovery or Evidentiary Hearing

BST asserts the court should not dismiss its petition "without further development of the facts (whether on a paper record or potentially an evidentiary hearing)." ECF No. 13 at 9. To be entitled to discovery or an evidentiary hearing, BST must "make a showing of facts that give rise to a plausible inference of improper motive." *United States v. Clarke*, __ U.S. at __, 134 S. Ct. 2361, 2367 (2014). "In order to be entitled to a hearing, the party challenging the summons must allege specific facts in its responsive pleadings, supported by affidavits, from which the court can infer a possibility of some wrongful conduct by the IRS." *Alphin v. United States*, 809 F.2d 236, 238 (4th Cir. 1987); *see also Universal Life Church, Hidden Valley Congregation v. United States*, 573 F. Supp. 181, 185 (W.D. Va. 1983). As explained above, BST has failed to come forward with any evidence of purported abuse and thus has failed to raise a "plausible inference of improper motive." BST's allegations go to the subject matter of the investigation, not the purpose for the investigation. It has failed to show any basis for discovery or an evidentiary hearing.

### CONCLUSION

In sum, the court finds the Government has, through Agent Gagnon's First and Second Declarations, established a prima facie case that all prongs of the *Powell* test are satisfied. BST has failed to raise a plausible claim that any prong of the test is not satisfied. Under these circumstances, the court grants the Government's motion to dismiss, denies BST's petition to quash, and directs the Banks to respond to the summonses.

**IT IS SO ORDERED.**

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
Senior United States District Judge

Columbia, South Carolina
March 7, 2017